# ALLEN *et al. v.* STATE.

(Division B.   February 25, 1935.   Suggestion of Error Overruled, March 25, 1935.)

[159 So. 533.   No. 31327.]

**M. V. B. Miller,** of Meridian, and **Joe E. Davis** and **Jno. A. Clark,** both of De Kalb, for appellants.

474

**W. D. Conn, Jr.,** Assistant Attorney-General, for the state.

Argued orally by **M. V. B. Miller,** for appellants.

**Ethridge, P. J.,** delivered the opinion of the court

Oscar Allen and Willie Allen, father and son, were tried jointly in the circuit court of Kemper county for the killing of Elmer Gravette. The killing was actually done by Willie Allen who claimed self-defense, but the state's theory was that Oscar Allen, the father, and Willie Allen, the son, had entered into a conspiracy, prior to the killing, which resulted in the killing, and that Oscar Allen was present at the killing encouraging, aiding, and abetting his son.

The record is voluminous and the testimony of numerous witnesses is conflicting in many respects, and it is impossible to make an accurate detailed statement of all the material facts. Consequently, it will be deemed sufficient to only state the facts dealing with the assignment of error, which alleges that Oscar Allen should have been granted a peremptory instruction, and that the court erred in submitting the theory of conspiracy to the jury, and in admitting an alleged statement, or request by Oscar Allen to Elmer Gravette, prior to the killing, to go with him (Oscar Allen) to whip one Jess Peden.

On the morning of the killing, Oscar Allen went to the home of his son, Willie Allen, and expressed a desire to go to see Gravette and endeavor to purchase some wheel scrapes, used in road building, from Gravette, he having had a contract to build or repair the De Kalb and Philadelphia highway and having finished the work or lost his job. Oscar Allen desired to purchase these wheel scrapes to secure jobs upon the highway for his sons. Willie Allen, the other appellant, desired to carry a car of his to the crossroad garage some ten miles east of Philadelphia to have a hood and radiator repaired, so they decided to make the trip to see Gravette and to the cross-

road garage. They claim that Willie Allen had a pistol belonging to Oscar Allen at his home for the purpose of killing hogs, which had been done, and that Oscar Allen expected to kill some hogs as early as the weather permitted, and asked Willie Allen to get the pistol, stating that they would carry it along and he would carry it home. They then proceeded on the De Kalb and Philadelphia road to the place where Gravette lived, inquired for him, and were informed that he and others had gone to Philadelphia, and that the appellants then proceeded to the crossroad garage between Gravette's place and Philadelphia, left the parts to be repaired, and decided to go on to Philadelphia and see Gravette. They then proceeded two and one-half to three miles and met Gravette in company with Clover Davis, Pedro Paine, and Gene George. The Allen car was left at the garage, and Gravette invited Oscar Allen to ride with him which Mr. Allen did. Mr. Gravette gave Oscar Allen a drink of whisky, and the Gravette car then proceeded in the direction of the Gravette home, with the above named, Davis, Paine, George, Gravette, and Oscar Allen, as its occupants. As they proceeded, Oscar Allen was telling of his ability to deal cards in a certain way, and Mr. Gravette called him a liar, and they indulged in some friendly badinage, when one of the other occupants of the car remarked to them that they were friendly, and suggested that they stop cursing, which they did, and presently Oscar Allen uttered some curse words and Gravette told him to hush, Oscar Allen did not hush, and Gravette said if he did not stop he would whip him, and that Oscar Allen got out of the car and made some threat, and that Gravette urged him to get back in the car, which he declined to do, but turned to go in the direction of the crossroad garage, met one J. W. Adams, and asked if he could drive a car. Adams stated that he could, and Oscar Allen said he would bor-

row one. He had not secured one, however, when they met Willie Allen, two men named Daws, and one Lang in the Allen car coming toward De Kalb. According to some of the witnesses, this meeting was in front of the home of one Lish Eakes, and two girls, Hazel Owen, twelve years old, and Laura May Cook, also twelve years old, and her mother, Mrs. Eula Cook, testified to hearing a conversation in which one party asked Oscar Allen, "Did you get him?" to which he replied, "No, by God, but I am going to get him," demanding that the man in the car give him his gun, saying that Gravette was drinking, but that he had not drunk a "damn" bit more than he had, and that he (Oscar Allen) wanted to kill him himself; asked that the man in the car give him the gun, and, "We will go kill the s. of a b." Hazel Owen and the other little girl did not recognize any of the parties except Oscar Allen.

The testimony of the appellants on this point was that the parties were the two Allens, the two Daws, Adams, and Lang. It was stated that no such conversation took place and that they met Oscar Allen in the car some short distance from the Eakes home, and saw no children in the yard as they passed it. Their version of what happened was that Willie Allen asked his father, Oscar Allen, why he did not get in the car with Gravette, and that Oscar Allen said Gravette called him "a damn son of a bitch," and that Willie Allen said that was his (Gravette's) way, and that Oscar Allen ought not to pay any attention to it, to which Oscar Allen replied that he did not like for anybody to call him such a name. That Oscar Allen got in the car with his son and the others and they proceeded to a point near Gravette's home and near that home was the residence of a person named Hill, and seeing Gravette's car in front of the Hill place, drove up there and inquired for Gravette, but he was not there, and that Willie Allen wanted to see Hill about some rims

which he desired to fix up a school truck which he contemplated using; that he called on Hill, but Hill did not sell him the rims, but proposed to lend them to him, which offer was not accepted, because it might result in both wanting to use the car rims at the same time. They then proceeded toward Gravette's home, and because the road was rough, some of the parties walked, and Willie Allen proceeded up to Gravette's home, or in that direction, for the purpose of seeing him, and that there was a bridge near Gravette's home, and that Oscar Allen had some conversation with parties at the bridge in which he made some statements to the effect that he had the "guts" to fight Gravette if Gravette had the "guts" to fight him, and that he was going up there to Gravette's home because he was afraid they would hurt his boy. Some of the parties remarked that Gravette was his friend and was not mad, and that Oscar Allen said if Gravette was not mad that he was not mad.

In the meantime, Gravette and another party came out of Gravette's house, and Allen called Gravette, and he came down to where there were several persons assembled, and asked if they were friends. Oscar Allen assured him they were friends, and Gravette stated if they were friends, they would kiss him, and both of the Allens kissed him. The conversation, for a time, was friendly and declared friendship, and Gravette stated that if he secured work in Neshoba county, he would give the Allens jobs, Willie Allen having worked for him on the highway which he had just finished in Kemper county.

There is practically no dispute of the numerous witnesses as to the friendly attitude, but the testimony shows that Oscar Allen and Gravette were somewhat under the influence of liquor.

A proposition was made that Gravette and Oscar Allen indulge in a friendly boxing match. There is some differ-

ence as to who proposed it, but all the witnesses agree that the proposition was made and discussed in a friendly manner. Oscar Allen finally declined to box as he was a much smaller man than Gravette who weighed, approximately, one hundred eighty-five pounds, and Allen from one hundred thirty-five to one hundred forty pounds, and it was finally decided that Willie Allen and Gravette should wrestle, which they did, Gravette throwing Willie Allen, and both falling, and being a taller man than Willie Allen, Gravette bumped his head against the Allen car, but Willie Allen did not strike it because he was shorter. There is evidence that Gravette did not like being thus struck. The evidence is conflicting as to what was said, some witnesses testifying that Gravette cursed Willie Allen, who said he ought not to get mad; Gravette said he did not like it, and that Willie Allen asked him what he was going to do about it, both parties using curse words, and that Gravette stated he would whip them both.

Some of the witnesses stated that Oscar Allen and Gravette were passing badinage and that Willie Allen said Gravette could not talk to his father like that, cursing him, and that Willie Allen then stepped back to get his pistol out of the car, secured it, and Oscar Allen then ran up and tried to get the pistol away from Willie Allen, and that during the scuffle the pistol was fired, and finally the pistol was secured by Oscar Allen.

Oscar Allen testified, and his testimony is supported by other evidence, that when Gravette and Willie Allen wrestled and Gravette was struck he became angry and cursed, and that he, Oscar Allen, walked up and put a hand on the shoulder of both Willie Allen and Gravette, and stated that they were friends, and that it was a friendly wrestle, and that Gravette struck him knocking him senseless, and he did not know what happened until after the shooting when he recovered his senses.

Some of the witnesses stated that Willie Allen, after warning Gravette not to talk to Oscar Allen in such a manner, stepped to the car to get the pistol, and that there was a struggle between one Richardson and Willie Allen over the pistol, in which Oscar Allen intervened and finally secured the pistol, ordering everybody to stand back and Willie Allen to get in the car, and stating that they would leave. When the pistol was drawn, some of the witnesses left, but there was testimony as to the conversations and hearing the shooting.

Willie Allen testified that his father, Oscar Allen, had nothing to do with the killing; that he, Willie Allen, had a friendly wrestle with Gravette, who threw him near the car and bumped his (Gravette's) head, and got up and stated that it made him mad; that Willie Allen stated he did not intend to make him mad, and that Gravette then knocked his father, Oscar Allen, down, and said he would kill them both, using vile language, and ran his hand under his shirt as if to procure a pistol, and started or advanced toward Willie Allen, and he then fired, and that he continued to fire as long as Gravette was advancing toward him, and that his father, Oscar Allen, had nothing to do or no connection with the affair, and that after the shooting they left.

Some of the state's witnesses testified that as the Allens were leaving, Gravette asked them not to leave him, and that Oscar Allen stated that he could lie there and die, that was what they intended to do, using some epithets, hereinafter to be noted. But the Allens testified that they had nothing against Gravette, and that they had not entered into any agreement to do him any harm, or any conspiracy whatever. There was no direct evidence of a conspiracy.

The physician who examined Gravette after he was dead testified that there was one bullet between the eighth and ninth ribs, one in his thigh, and one in his back.

Gene George and Shelby Richardson testified that after Gravette was shot they undertook to take him to his house, and as they were going over a steep bluff, they stated that they knew they were handling him very roughly, and Gravette said he was dying anyway, and asked them when they reached the house to take his shoes off, that he did not want to die with his shoes on, and that his shoes were taken off. He wanted them then to take his clothes off, and they stated they were going to carry him to the hospital, and started, in the car, to the hospital, but Gravette died before reaching there.

The physician who treated Oscar Allen testified that his ear was bruised, had a slight abrasion, and that there was some blood on one ear.

One of the state witnesses testified as to the statement made by Oscar Allen in Gravette's car on the trip from the crossroad garage, saying that Oscar Allen asked Gravette to go with him to whip Jess Peden, and that Gravette refused so to do. This was objected to and the objection was overruled. There is no evidence in reference to this statement which showed that Oscar Allen was offended at the refusal.

It has been a very hard task to state the multitude of facts in view of the many statements made by the different witnesses in reference to what occurred, but we think the facts stated will be sufficient to deal with the evidence as against Oscar Allen; as to the theory of a conspiracy; and as to the statement in reference to Oscar Allen desiring Gravette to help him whip Peden.

There was a conviction of both the appellants for manslaughter, and a sentence to the penitentiary for five years for Oscar Allen, and ten years for Willie Allen.

After the jury's verdict was rendered, a motion for a new trial was made upon a number of grounds, one of which was that the court erred in refusing to consider a certificate of the county superintendent of education of

Neshoba county to the effect that Hazel Owen and Laura May Cook, the two girls who testified as to conversations in front of the home of Lish Eakes, attended, and were present on January 5, 1934, the date of the killing, at Forest Dale School. On the motion for a new trial, the appellants introduced Mavis Baker, also a pupil of the Forest Dale School, who testified that she rode to and from school in a school truck or bus with Hazel Owen and Laura May Cook, but that she did not remember whether they were in the bus on the particular day of the killing. She testified that the school at Forest Dale turned out from three to three-fifteen in the afternoon, and that the truck or bus reached the home of Laura May Cook, where the two girls who testified were, around four o'clock in the afternoon. Laura May Cook fixed the time she heard the conversations at about three o'clock in the afternoon.

It is stated in the motion for a new trial that counsel for the defendants sought to interview Hazel Owen and Laura May Cook prior to their going upon the witness stand as to what their testimony would be, but the mother of one of the girls would not permit it, and they did not know what the testimony would be. The defendants, on the motion for a new trial, attached thereto an affidavit signed by one of the bailiffs who attended the jury in which it was stated that affiant was one of the bailiffs attending the jury selected to try the case of State v. Oscar Allen and Willie Allen, and that the case was turned over to the jury Wednesday night about twelve o'clock, March 28, 1934; that on Thursday morning they appeared in open court announcing they were unable to agree upon a verdict; that the judge sent them back; that about twelve o'clock on the same day the jury asked him to tell the judge they wanted to report; that the judge asked the bailiff if the jury had agreed and he told him they had not. The judge then said, ac-

cording to affiant, ''Go back and tell them he had extended the term of court another week and to stay up there.'' The bailiff delivered this message and the jury reached an agreement and reported the following morning. On cross-examination he said when the jury first reported their inability to agree on a verdict, the judge said, ''Retire gentlemen and consider your verdict,'' and that this was on Thursday, and when he reported to the judge that afternoon as to the jury wanting to report, that the judge asked if they had agreed, and he told him, ''No,'' and the judge said he did not want a report and that he had extended the term for another week, and he (affiant) told the jury, and the jury reported a final verdict on Friday.

The trial judge made a statement into the record that, on the night the jury retired, he said to them, ''Gentlemen, it is late, and, probably, you will not care to consider your verdict tonight, so I suggest that you be careful about the indictment and the other papers during the night. However, I am not dictating to you about when to consider the verdict, but I wanted to caution you about the papers.'' He further stated that between nine and ten o'clock the following morning the jury again came in and reported they could not agree, and he said, ''Retire gentlemen,'' and the next day in the afternoon, as he came in the back door from the boarding house, one of the bailiffs said, ''The jury wants to report,'' and he said, ''Have they agreed on their verdict?'' the bailiff said, ''No,'' and the judge then said, ''I don't care to have any report.'' He further stated that he had no recollection of saying anything about extending the term of court; that the term was extended, however, and he presumed the bailiffs and everybody else around the courthouse knew it. He stated that they had the Poole case the next, Friday, morning, and one hundred fifty veniremen had been summoned, and the

jury of the week was there; that as he came in the back door some bailiff, he did not remember which one, said to him, "Do you want the jury brought down to this jury room?" It seems that they were in the dormitory on the third floor where they slept and where they could be kept separate from the people. That the jury room was necessary for the handling of the Poole case, and not wanting the jury down where the people were, the judge said, "No, let them stay up there," and he said that Mr. Cullum, the bailiff who made the affidavit, was confused in that way, and that was the only time he said, "Let them stay up there." He further said that he hardly thought it possible that he told one bailiff one thing, that is, not to tell the jury about the term being extended, and tell another bailiff to tell the jury. He further said in his opinion that the record of the superintendent of education of Neshoba county was not presented in the proper manner, and overruled the motion for a new trial.

One of the assignments of error is the refusal of a peremptory instruction in favor of Oscar Allen based on the theory that the evidence was not sufficient to sustain a verdict as to him.

From a consideration of the whole record, we are of the opinion that there was sufficient evidence to go to the jury as to the guilt of Oscar Allen. It appears that he was present at the killing, and one of the witnesses testified that Oscar Allen said if Willie Allen was not going to do it, to give him (Oscar Allen) the pistol, and he would kill Gravette.

It is true that this witness' testimony was contradicted by other witnesses who were present, but it was for the jury, under the state of facts in this record, to say who was speaking the truth. In addition to Oscar Allen being present at the time of the killing, there was other evidence of threats showing, or tending to show, a disposition or motive to kill. It is also true that at the

scene of the killing, prior thereto, they all appeared to be friends.

We will not consider at length the evidence given on this assignment, as the case must be reversed for another trial.

. Among the instructions given for the state complained of is the one given on the theory of a conspiracy, reading as follows: ''The court charges the jury for the state that a criminal conspiracy is an agreement or understanding planned and feloniously entered into by and between two or more persons whereby they confederate and agree to do an unlawful act, and the jury is further charged for the state that criminal conspiracy may be proven by the circumstantial evidence, direct proof, or the acts and conduct of the alleged conspirators.''

We think this instruction should not have been given, because we do not think there was sufficient evidence to support the theory of conspiracy between Willie Allen and Oscar Allen to kill the deceased. On the contrary, taking all the evidence as a whole, and considering it, a conspiracy is not proven thereby. The evidence as to the appellants going to the home of Gravette and asking for him is fully explained, and there is nothing inconsistent in the explanation as to their legitimate business in going to his home. The evidence of the girls, Hazel Owen and Laura May Cook, is the strongest evidence on the theory of a conspiracy, and we think that this does not sustain any such theory. Even if considered alone, it would only tend to show a purpose, on the part of Oscar Allen, to kill Gravette, but it does not show any agreement between him and Willie Allen for that purpose.

We think proof of a conspiracy, where the guilt of a person depends thereon, should be beyond reasonable doubt when testified to by a witness. The testimony of four witnesses, other than the Allens and supplemented by their testimony, clearly shows that Willie Allen did

not enter into any agreement, or understanding, with his father that they, or either of them, would kill Gravette. On the contrary, the proof shows that Willie urged his father to pay no attention to what had happened between him and Gravette. When Oscar Allen met Gravette first that morning, they were perfectly friendly, and they left Willie Allen in a perfectly friendly manner, and, next, when Oscar Allen and Willie Allen came together, there was the alleged conversation testified to by the two girls, and the mother of one of them, and after this the parties went on, and the conversations testified to fail to show any agreement of a conspiracy, or any circumstances from which a conspiracy could be properly deduced.

The evidence was sufficient to submit to a jury as to Oscar Allen being a joint participant in the killing of Gravette by encouraging and aiding therein, but was not sufficient to sustain the theory of a conspiracy. We think the theory of a conspiracy should be abandoned, and no instruction given the jury upon that subject, there being no testimony to support same.

We also think it was error for the court to admit the statement of the witness as to the request of Oscar Allen to Gravette to go with Oscar Allen to whip Peden. The Peden transaction was in no way related to the case at bar as far as the record shows, nor was there anything further in the whole transaction disclosed showing that it had any connection with the killing in the case at bar.

We do not find any reversible error as to leading questions. It is true that some questions propounded were in a somewhat leading form, but they were not such, in our opinion, as to mislead, or cause the witness to testify in such a manner as to be prejudicial to a fair trial.

We think the court, on the motion for a new trial, should have considered the certificate of the superintendent of education of Neshoba county as to the record

showing the presence of Hazel Owen and Laura May Cook at school during the day. Often, after a transaction has passed, it is difficult to remember, with precision, the facts as to a particular day. The record of the superintendent is required, by law, to be kept each day, and certificates showing such record may be admitted in evidence. ' Such certificates have probative force, and after many weeks or years, they might be the only available evidence of facts. One of the witnesses testified that the school bus reached the Eakes residence about four o'clock in the afternoon, and that the school was not dismissed until three or a little later, whereas, Laura May Cook testified that about three o'clock in the afternoon she heard the conversation. The witness produced who attended the same school could not say for certain whether Hazel Owen and Laura May Cook were in the school bus on the particular day of the killing, but the school records did so show. Of course, matters of this kind are not exclusive. It may be that the testimony of the person who attended the school would be the better testimony, but considering the statements made in the motion for a new trial, as to these girls being in school, counsel being in attendance on the court, and having charge of the defense, could certainly not make investigations a considerable distance from the courthouse. A certificate of this kind, when taken in connection with the evidence of witnesses produced, tends to make it certain that the girls were not in the Eakes yard at three o'clock p. m. as one witness testified, which testimony was disputed by other witnesses.

We also think that the judgment should be set aside because the bailiff carried to the jury what purported to be the statement of the trial judge, refusing to receive a report because the jury had not agreed upon a verdict, and that the judge had extended the term for another week. The implication from this statement was

that the jury would be held together until they agreed, so long as the court was in session.

We accept the judge's version of what happened as against a witness, for the purpose of this opinion, because, under the decision in Gurley v. State, 101 Miss. 190, 57 So. 565, in cases of conflict between the judge and witnesses, we must assume that the judge was impartial, and had a better recollection of what happened, since his mind was strongly directed to what was happening, and it was his duty to keep the transaction in his mind with a view to exercising proper control. There are exceptions to this rule, such as where the judge's statement is against the overwhelming weight of the evidence, or where he was partial or unfair, or greatly biased.

It is immaterial whether the judge in the case at bar made the statement as testified to by the bailiff, since it was communicated to the jury as coming from him, and had some effect on them. The court should exercise every precaution against any communication going to the jury from the court as to how long they will be held together. We have recently considered this whole subject in the case of Wade v. State, 155 Miss. 648, 649, 124 So. 803, 806, 85 A. L. R. 1406, wherein, after reviewing the cases, we said:

"In view of the frequency with which this question has arisen and the perplexities which have beset its consideration, we deem it important and requisite that a practicable and expedient rule shall be now prescribed for the removal of this question from the field of future controversy—a rule which of course must be within the existing principles of the law, but one nevertheless which shall be more definite and tangible in its statement than that apparent in many of the cases. We deduce the rule, and therefore now state it by way of resume, as follows:

"(a) It shall be within the sound judicial discretion of the trial judge as to how long he will keep the jury

in deliberation, and this discretion will not be reviewed on appeal, unless there has been a clear abuse of it. And this discretion shall apply to deliberations carried over from Saturday until Monday the review on appeal in such a case, however, being the more watchful than in those relating to other periods.

"(b) The length of time during which he will hold the jury in deliberation being the prerogative solely of the trial judge, and a matter concerning which it is absolutely nobody else's business, he shall not state to the jury, either expressly or by any act or language which reasonably construed will carry an implication, how long he intends to keep them; nor shall he make any such statement, outside of the hearing of the jury, which is carried to them by any other officer of the court."

In that opinion we cited the case of Lewis v. State, 109 Miss. 586, 68 So. 785, which is very much in point with our view of the case at bar. There a bailiff was sent to the judge by the jury asking to be discharged, and the bailiff returned with an alleged message from the judge that he would keep them for another week if they did not come to a verdict. Although the verdict was not returned until three days later, it was set aside and the judgment was reversed.

It must be remembered that this trial was had at a period when farming operations were urgent, and the jury naturally wanted to get away in time to attend to same. Prospects of having to stay for another week was, under the facts, sufficient to operate on their deliberation to the detriment of the appellants.

For the errors indicated, the judgment of the court below is reversed and the cause remanded for a new trial.

Reversed and remanded.