# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2000-KA-00606-SCT

***CHRISTOPHER B. SMILEY***

***v.***

***STATE OF MISSISSIPPI***

| | |
|---|---|
| DATE OF JUDGMENT: | 3/27/2000 |
| TRIAL JUDGE: | HON. LAMAR PICKARD |
| COURT FROM WHICH APPEALED: | COPIAH COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | SANFORD E. KNOTT |
| ATTORNEYS FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: W. GLENN WATTS |
| DISTRICT ATTORNEY: | ALEXANDER C. MARTIN |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 2/21/2002 |
| MOTION FOR REHEARING FILED: | 3/22/2002; denied and opinion modified at Para. 16 5/9/2002 |
| MANDATE ISSUED: | 5/16/2002 |

### BEFORE PITTMAN, C.J., DIAZ AND EASLEY, JJ.

### PITTMAN, CHIEF JUSTICE, FOR THE COURT:

¶1. Christopher B. Smiley ("Smiley") was convicted by a Copiah County Circuit Court jury of the murder of Doremus Stevens ("victim") a.k.a. "Dank." Smiley was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections. Smiley perfected a timely appeal seeking a reversal of his conviction and sentence or a new trial.

## **FACTS**

¶2. Smiley lived in Hazlehurst, Mississippi, with his father on Massengill Road. Living next door to Smiley was Bonnie Sanders ("Sanders") a.k.a."Weezy." Smiley and Sanders had a pathway running between their homes that was used by local pedestrians as they traveled to various residences in the neighborhood.

¶3. On the night before the shooting, the victim and Emanuel Adams ("Adams") visited Smiley's residence. At some point that evening Smiley ordered the victim and Adams to leave his yard because they had been selling drugs on his property. The following day, the victim and Adams were walking on Massengill Street in front of Smiley's residence. Adams testified that as they approached the path between Smiley and Sanders's houses, he heard Smiley say, "didn't I tell y'all about walking up in my yard," to which the victim responded by stating, "F___ you, bitch."[1] The victim continued down the path that led past the back side of Smiley's house, while Adams walked toward Weezy's house. Adams saw Smiley go inside his house and come out with a rifle and fire it. Adams testified that he then ran from the area to seek safety.

¶4. Darrien Thompson ("Thompson") a.k.a. "Snoop," saw it differently, testifying that he was standing on

Smiley's porch at the time the verbal exchange took place between Smiley and the victim and that he saw the victim raise up his jacket, pull out a gun, cock it, and continue walking. Thompson then explained that Smiley, upon seeing this, went into his house, called for his father, and then came back out with a gun. Thompson testified that the victim was carrying a gun in his left hand and "swirled around like that with it," which resulted in Smiley shooting the victim.

¶5. Sanders, Smiley's next door neighbor, testified that she heard "some commotion outside" and stuck her head out her window to ask what was going on. She stated that she saw the victim and Adams coming up the road and that the victim, with his hand in his pocket, cut through the yard between the two houses, while Adams continued down the street. Sanders stated that she heard Smiley and the victim exchange words and then heard Smiley run into his house. Sanders then ran to the back of her house, looked out the window, and saw the victim had been shot and was lying on the ground near a trampoline, with her daughter, Cathy Sanders ("Cathy"), and a neighbor, Angela Daniels ("Daniels"), standing by checking on the victim's condition. Sanders testified that she did not see the victim with a weapon.

¶6. Cathy Sanders testified that she was able to see Smiley and the victim at all times during their confrontation. Cathy was outside her mother's house and saw Smiley and the victim exchange words and Smiley run into his house and come out with a gun, while the victim turned away, ignoring Smiley, and proceeded through the yard with his hand in his pocket. Cathy testified that she saw Smiley point the gun and shoot the victim, who fell face down. She then heard Smiley say "I hit that bitch, I got that bitch." She stated that she saw Angela Daniels rush to check on the victim and that she followed to help. Cathy then heard Smiley say, "I done told that mother f_____ about fooling with me." On cross-examination, Cathy explained that she never saw the victim make any threatening movement or turn around before he was shot in the back.

¶7. Angela Daniels stated that she was the first person to get to the victim after he had been shot. Daniels explained that she raised his shirt and jacket while checking on him and did not find a weapon on him, or lying near him. She also testified that she never saw the victim make any threatening motion toward Smiley before he was shot.

¶8. Ryan Smith, a paramedic who responded to the emergency call, testified that he did not see a weapon around the body of the victim.

¶9. Forensic pathologist Dr. Steven Hayne performed the autopsy on the victim. Dr. Hayne explained that the victim died from a gunshot wound to the back, which caused him to bleed to death inside his chest cavity.

## DISCUSSION

### I. DID THE TRIAL COURT ERR IN NOT GRANTING A CONTINUANCE AT TRIAL DUE TO MISSING WITNESSES?

¶10. Smiley contends that it was an abuse of discretion for the trial court not to grant a continuance due to the absence of two defense witnesses. Smiley asserts that the missing witnesses were a critical part of his case because they were to provide evidence about whether the victim was armed at the time of the shooting. Smiley claims that not having their testimony interfered with his ability to defend himself against the murder charge.

¶11. Counsel for Smiley did not inform the trial court of the two missing witnesses until the morning of the trial. Smiley moved for a continuance, explaining that they were "key witnesses" and that they were in the hospital. The two missing witnesses were Smiley's aunt and cousin. During the bench conference counsel for the State explained that they had subpoenaed and received a physician's excuse that stated Smiley's aunt was not fit to testify because of a nervous condition. Counsel for Smiley decided that he could get the aunt's statements in through the testimony of Police Officer Milton Twiner and announced that he was ready. The record shows that Twiner was never called to testify in order to get the missing aunt's statements before the jury.

¶12. While the State began presenting its case, the trial court sent the deputy sheriff to locate the two missing defense witnesses. When the deputy sheriff returned, he informed the trial court that the two witnesses were not in the hospital as was told to Smiley's attorney, but had left Mississippi that morning on a trip to Georgia. Smiley's counsel explained that the witnesses had been served, that there were returns for both of them, and asked the trial court for a continuance until the witnesses could be located. The trial court denied Smiley's motion for a continuance.[(2)]

¶13. Miss. Code Ann. § 99-15-29 (2000) provides the statutory direction regarding application for continuances:

> On all applications for a continuance the party shall set forth in his affidavit the facts which he expects to prove by his absent witness or documents that the court may judge of the materiality of such facts, the name and residence of the absent witness, that he has used due diligence to procure the absent documents, or presence of the absent witness, as the case may be, stating in what such diligence consists, and that the continuance is not sought for delay only, but that justice may be done. The court may grant or deny a continuance, in its discretion, and may of its own motion cross-examine the party making the affidavit. The attorneys for the other side may also cross-examine and may introduce evidence by affidavit or otherwise for the purpose of showing to the court that a continuance should be denied. No application for a continuance shall be considered in the absence of the party making the affidavit, unless his absence be accounted for to the satisfaction of the court. A denial of the continuance shall not be ground for reversal unless the supreme court shall be satisfied that injustice resulted therefrom.

¶14. This Court has set forth the following standard of review regarding the granting or denial of a continuance:

> The decision to grant or deny a motion for a continuance is within the sound discretion of the trial court and will not be grounds for reversal unless shown to have resulted in manifest injustice.

*Coleman v. State*, 697 So.2d 777, 780 (Miss. 1997) (citing *Atterberry v. State*, 667 So.2d 622, 631 (Miss.1995)).

¶15. This Court has repeatedly enunciated the process by which one may properly obtain a continuance, as found in *Lamar v. State*, 63 Miss. 265, 271 (1885):

> In view of the frequency of these applications we deem it advisable to repeat what has been before substantially said as to the correct course to be pursued by a defendant who applies for a continuance. To begin with, he should promptly issue summonses for all witnesses who may be

material for his defense; for any witness who has been served with process and who had failed to appear as commanded he should ask for an attachment, which will never be refused by the court; in capital cases he should apply for a continuance before the venire is drawn, setting out in his affidavit the names and residences of the absent witnesses, the facts expected to be proved by them, and should also show to the court what steps have been taken to secure their attendance; he should negative the idea that they are absent with his consent or procurement, and if any reasons are known to him why they are not present, these should be stated.

If the court declines to grant the continuance he should sue out the proper process for them, and when the case is called for trial should renew his application, make such changes in his affidavit as the conditions then existing require. If the continuance is still refused, he should with unremitting diligence seek to secure their attendance pending the trial by the continued use of the process of the court; if tried and convicted he should still persist in his efforts to enforce their attendance before the expiration of the term, and on his motion for a new trial present them to the court for examination; if, with all of his efforts, he is unable to have the witnesses personally present, he should, if practicable, secure their ex parte affidavits, which should be presented for the consideration of the court, which, on the motion for a new trial, will review the whole case and correct any error prejudicial to the defendant which may appear in any part of the proceeding.

*See also* ***Gates v. State***, 484 So.2d 1002 (Miss. 1986); ***Woods v. State***, 393 So.2d 1319 (Miss. 1981); ***Burrill v. State***, 328 So.2d 334 (Miss. 1976); ***Viverett v. State***, 269 So.2d 862 (Miss. 1972); ***Conn v. State***, 260 So.2d 471 (Miss. 1972); ***King v. State***, 251 Miss. 161, 161 So.2d 637 (1964); ***Allen v. State***, 172 Miss. 472, 159 So. 533 (1935); ***Wade v. State***, 155 Miss. 648, 124 So. 803 (1929).

¶16. In the present case there is no evidence in the record to show that a "manifest injustice" resulted when the trial court denied Smiley's motion for a continuance. We therefore find this issue to be without merit.

## II. WAS THERE SUFFICIENT EVIDENCE TO SUPPORT THE JURY VERDICT OF GUILTY OF MURDER?

¶17. Smiley contends that there was insufficient evidence to support his conviction for murder. Smiley also asserts that the testimony provided by Thompson that the victim was carrying a gun at the time he was shot shows that Smiley was not acting with "deliberate design," but rather in self-defense.

¶18. After the trial had concluded Smiley moved for a new trial on the basis that the verdict was against the overwhelming weight of the evidence and was manifestly wrong as a matter of law. In the motion Smiley also contended that the trial court had erred in not dismissing the charges against Smiley and in not granting a directed verdict at the conclusion of the State's case. The trial court subsequently denied the motion.

¶19. This Court has outlined the standard of review regarding the denial of a motion for a new trial:

A motion for a new trial is discretionary with the trial judge and this Court will not order a new trial unless it is convinced that the verdict is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice. ***McNeal v. State***, 617 So.2d 999, 1009 (Miss.1993); ***Burrell v. State***, 613 So.2d 1186, 1191 (Miss.1993); ***Pierre v. State***, 607 So.2d 43, 54 (Miss.1992). In determining whether a jury verdict is against the overwhelming weight of the evidence, this Court must accept as true the evidence which supports the verdict and will reverse only

when convinced that the trial court abused its discretion in failing to grant a new trial. ***Nicolaou v. State***, 612 So.2d 1080, 1083 (Miss.1992). Any factual disputes are properly resolved by the jury and do not mandate a new trial. ***McNeal***, 617 So.2d at 1009.

***Bailey v. State***, 729 So.2d 1255, 1263 (Miss. 1999).

¶20. Viewing as true the evidence which supports the jury's verdict, it cannot be said that the verdict was so contrary to the overwhelming weight of the evidence that allowing it to stand would result in "an unconscionable injustice." The only factual dispute found in this case was whether the victim was carrying a gun at the time of the shooting and if the victim made any threatening movement towards Smiley before he was shot. Testimony from several witnesses provided support that the victim did not have a gun in his hand, on his person, or lying near him after he was shot. Cathy Sanders and Angela Daniels both stated that they did not see the victim make a threatening movement prior to being shot by Smiley. Thompson, who was on the porch at the time Smiley shot the victim, testified that he saw the victim pull out a gun and cock it as he was walking down the path between the two houses. Thompson explained that the victim "swirled around" with the gun in his left hand just before Smiley shot him. On cross-examination, Thompson contradicted many of his previous statements including admitting that he had given a different account to investigators and that he, in fact, had not witnessed the actual shooting or even seen what the victim did prior to his being shot. Faced with this conflicting testimony, the jury was left to make its own determination as to what occurred prior to the shooting.

¶21. Considering the testimony heard at trial, there was sufficient evidence to support the trial court's denial of a motion for new trial. This issue is without merit.

### III. SHOULD THE EVIDENCE PRESENTED AT TRIAL HAVE RESULTED IN A VERDICT OF MANSLAUGHTER INSTEAD OF MURDER?

¶22. Smiley next contends that he should only be guilty of manslaughter because the victim provoked him by coming onto his property and cursing at him while carrying a weapon. Smiley asserts that he shot the victim only after feeling threatened by him. Smiley points to the theory of "'imperfect self-defense' whereby an intentional killing may be considered manslaughter if done without malice but under a bona fide (but unfounded) belief that it was necessary to prevent death or great bodily harm." ***Wade v. State***, 748 So.2d 771, 774 ( Miss. 1999) (quoting ***Lanier v. State***, 684 So.2d 93, 97 (Miss.1996).

¶23. The present case is not one of "imperfect self-defense." The evidence shows that the victim was shot in the back as he walked away from Smiley. Witnesses heard Smiley say, "I got that bitch" and "I done told that mother f_____ about fooling with me," just after the victim was shot. These facts alone are enough to show that Smiley was not acting under a false belief of immediate danger or without malice. While it was shown at trial that Smiley and the victim had disagreed on prior occasion, there was no testimony presented regarding violence or threats of violence between the two men before the shooting occurred. Viewing as true the evidence which supports the jury's verdict, the jury's finding of murder, as opposed to manslaughter, was not contrary to the overwhelming weight of the evidence constituting "an unconscionable injustice." This issue is without merit.

### IV. WAS THERE INEFFECTIVE ASSISTANCE OF COUNSEL?

¶24. Smiley asserts that he was the victim of ineffective assistance of counsel based upon three instances:

A) when his trial counsel did not articulate in the record a specific reason in support of his motion for continuance, B) when his trial counsel did not request an instruction be given to the jury regarding Smiley's right not to testify, and C) when his trial counsel did not object to the prosecution's comments about the firearm during closing arguments.

¶25. This Court has articulated the standard for making a claim of ineffective assistance of counsel:

> In order to prevail on a claim of ineffective assistance of counsel, a defendant must prove (1) that his attorney's overall performance was deficient and (2) that the deficient performance, if any, was so substantial as to prejudice the defendant and deprive him of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Furthermore, there is a "strong but rebuttable presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Walters v. State*, 720 So.2d 856, 868 (Miss.1998). To overcome this presumption, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Schmitt v. State*, 560 So.2d 148, 154 (Miss.1990). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "Only where it is reasonably probable that, but for the attorney's errors, the outcome of the trial would have been different will this Court find the counsel's performance was deficient." *Id.*

*Gary v. State*, 760 So.2d 743, 753 (Miss. 2000).

¶26. We address each of Smiley's claims of ineffective assistance of counsel individually.

### A) Motion for Continuance

¶27. Smiley contends that he was the victim of ineffective assistance of counsel because his trial attorney failed to articulate in the record a specific reason to support his motion for continuance when he did not file written affidavits for the two absent witnesses. On the morning of the trial, M.A. Bass, serving as Smiley's attorney, asked that a motion for continuance be granted because two "key witnesses" he intended to examine were not available. At that time Bass was under the impression that the two witnesses, Smiley's aunt and cousin, were in St. Dominic Hospital in Jackson. After the State explained to the trial court that one of the witnesses, Smiley's aunt, had provided a doctor's excuse detailing her nervous condition that would adversely affect her should she be forced to testify, Bass reluctantly determined that he could get her statements in through comments she had made to Officer Milton Twiner. The record does not contain any testimony from Twiner.

¶28. It was later determined by the trial court that the witnesses were not hospitalized, but had left for Georgia. Bass then presented an impassioned plea to the trial court to grant his motion for continuance asserting that Smiley's aunt and cousin were key witnesses. After hearing from the State, the trial court reminded Bass of the leniency that had been shown Smiley previously regarding continuances for unavailable witnesses and that there was no notice of these witnesses being unavailable until the morning of the trial. The trial court then overruled the motion for continuance.

¶29. Smiley bases his contention of ineffective assistance of counsel on the fact that Bass did not provide affidavits explaining the expected testimony for the two missing witnesses as is required pursuant to Miss. Code Ann. § 99-15-29. While the record is not specific, it appears that Bass may have been caught by

surprise when the witnesses failed to appear at the beginning of trial. Certainly, if he was not informed of their "being in the hospital" until just before trial, he can hardly be expected to do more than make an oral motion for continuance on such short notice. The trial court in denying the motion stated, "Well, we have been pretty lenient with the defendant thus far in granting his continuances based on the fact that witnesses were unavailable and so forth, but there comes a time, counsel, when we have to try a case. . . ." Clearly, the trial court did not deny the motion for continuance based upon Bass's failure to supply written affidavits, but instead because the trial court felt that, considering the previous continuances, it was time for the case to move forward. Even if Bass's failure to provide the trial court written affidavits to support his motion for continuance could be termed as "deficient," it was not so deficient that it resulted in prejudice to Smiley. This claim is without merit.

### B) Failure to Request Jury Instruction

¶30. Smiley next asserts that Bass failed to request a jury instruction regarding Smiley's right not to testify. The record shows that at the conclusion of the jury instruction conference, the trial court stated to Bass, "you had a jury instruction that you were going to give relating to your client not testifying." Bass responded by saying, "We withdrew that, your Honor." During the trial Smiley was advised by the trial court of his right to take the stand in his own defense or remain silent.

¶31. An attorney's failure to request a jury instruction regarding a defendant's right to not testify is a matter of first impression for this Court. However, there does exist persuasive authority holding that trial counsel's decision to not request a jury instruction falls under the category of trial tactics, which are not subject to review:

> Petitioner claims that his attorneys did not ask for a jury instruction commenting on petitioner's right not to testify. However, this is a matter of trial tactics, as an attorney may not want to call the jury's attention to a defendant's failure to testify. Trial tactics are beyond this court's review.

*Durham v. Blankenship*, 461 F. Supp. 492, 501 (W.D.Va. 1978) (citations omitted), *appeal dismissed*, 609 F.2d 506 (4th Cir. 1979).

¶32. This Court has discussed the wide latitude allowed attorneys regarding their trial strategy:

> This Court gives much deference to an attorney's trial tactics. As this Court has stated: Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. *Cf. Engle v. Isaac*, 456 U.S. 107, 133-134 [102 S.Ct. 1558, 1574-75, 71 L.Ed.2d 783] (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. *Lambert v. State*, 462 So.2d 308, 316 (Miss.1984), citing *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. The right to effective counsel does not entitle the defendant to have an attorney who makes no mistakes at trial. The defendant just has a right to have competent counsel.

*Mohr v. State*, 584 So.2d 426, 430 (Miss. 1991).

¶33. In the present case, it is conceivable that Bass withdrew the jury instruction as part of his trial strategy

in the hope of not highlighting Smiley's decision not to testify. Whatever reason Bass had for withdrawing the instruction, "[a]long with the presumption that counsel's conduct is within the wide range of reasonable conduct, there is a presumption that the decisions made are strategic." *Leatherwood v. State*, 473 So.2d 964, 969 (Miss.1985). Smiley has failed to show that Bass was deficient, much less that Bass's decision deprived him of a fair trial, which, but for the withdrawal of the jury instruction, would have likely resulted in a different outcome. This claim is without merit.

### C) Failure to Object to Improper Closing Argument

¶34. In Smiley's final assertion, he advances that Bass failed to object to the State's closing argument regarding the utility of Smiley's gun, which resulted in ineffective assistance of counsel. The statements in question is as follows:

> He may have disrespected Chris, but a long time ago we decided in America that disrespecting someone is not a justifiable grounds to cold blooded shoot a man in the back. And that's what this is, ladies and gentlemen, a cold blooded shooting with this. You know, this ladies and gentlemen, to shoot somebody in the back -- **this is not a hunting gun or anything. This gun is for one reason, to kill somebody, and it served its purpose that day by shooting a man in the back**.

(emphasis added). Smiley asserts that it was wrong for the State to limit the gun's usefulness to only that of committing murder and that it created impermissible bias and prejudice in the jurors' minds against Smiley.

¶35. It is undeniable that Bass could have objected to the comments made in closing by the State, however, even if Bass's performance could be considered deficient, Smiley is unable to show a resulting prejudice that denied him of a fair trial. It cannot be said that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Schmitt v. State*, 560 So.2d 148, 154 (Miss.1990). Even if Bass had objected to the State's comments, it is highly unlikely that the jury would have rendered a different verdict given the previously described evidence of guilt. This claim is without merit.

## CONCLUSION

¶36. For the foregoing reasons, we affirm the judgment of the Copiah County Circuit Court.

¶37. **CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED.**

> **McRAE AND SMITH, P.JJ., WALLER, COBB, DIAZ, EASLEY, CARLSON AND GRAVES, JJ., CONCUR.**

1. The testimony of eyewitnesses varied as to the exact words that were exchanged between Smiley and the victim prior to the shooting, but the essence of what was stated was consistent.

2. The record also shows that the trial judge had previously continued the trial once, possibly twice, because Smiley's same aunt was hospitalized.